[Cite as *State v. Reed*, 2016-Ohio-5494.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-952 |
| v. | : | (C.P.C. No. 14CR-3494) |
| Charles Reed, III, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 23, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee. **Argued:** *Laura R. Swisher.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd A. Barstow.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Charles Reed, III, appeals a judgment of the Franklin County Court of Common Pleas sentencing him to serve a total of 15 years following guilty verdicts in a jury trial on counts of felonious assault, rape, and kidnapping. Although Reed's convictions are not against the manifest weight of the evidence and are sufficiently supported by the evidence, the trial court did not make the appropriate findings on consecutive sentences at the sentencing hearing. Thus, we reverse and remand for a new sentencing hearing at which the issue of consecutive sentences should be reconsidered.

No. 15AP-952

## I.  FACTS AND PROCEDURAL POSTURE

{¶ 2}   On July 2, 2014, Reed was indicted (in addition to three other co-defendants[1]) for one count of aggravated robbery, six counts of felonious assault, six counts of rape, and two counts of kidnapping.  He pled not guilty on July 7, 2014 and ultimately exercised his right to a jury trial.

{¶ 3}   The State tried Reed and his three co-defendants in a single proceeding that began on August 3, 2015.  At the outset of the trial, the defense stipulated that DNA was properly collected and firearms found at the scene were operable.  In addition, one of the two alleged victims in the case, B.P., had not responded to the subpoena, and the State, therefore, sought and received a warrant for his arrest.  Following opening statements, the State began to call witnesses.

{¶ 4}   The State first called a Columbus police officer.  The officer testified that on June 25, 2014, at 2:24 a.m., he was dispatched to Mount Carmel West Hospital where he spoke to a female victim, A.B.  He testified that A.B. appeared shaken but the officer admitted he did not know of what she was afraid.  Neither A.B. nor the other alleged victim, B.P., had (to his knowledge) called the police and A.B. did not name anyone who might have hurt her.

{¶ 5}   The second witness was also a Columbus police officer.  He testified that he picked up A.B. from the hospital for the purpose of identifying a residence on North Harris Avenue where some events relevant to the case were alleged to have transpired.  The officer testified that the residence in question was 125 North Harris Avenue.

{¶ 6}   The State next called a detective from the crime scene search unit of the Columbus Division of Police.  This witness identified photographs taken at 125 North Harris Avenue as well as items of physical evidence recovered.  Among the photographs were depictions of a broom with a pole-style handle, a broom handle without a broom end attached, a blue bucket containing a leather belt and a BB gun, a dog cage in a basement, a black and silver handgun, three boxes of ammunition, a number of cell phones, a rifle, and a rifle clip.

---

[1] One of these co-defendants was ultimately not convicted of any offenses, and thus, he is not named. Discussion in this decision is limited to the three defendants who were convicted of crimes concerning the incidents in question.

No. 15AP-952

{¶ 7} The State then called A.B. as a witness. A.B. testified that she had been, for a period of approximately six years, addicted to heroin but, as of the date of her testimony on August 4, 2015, she had been clean for approximately one year. She explained that she had been acquainted with Reed's co-defendant, Ivan Minor, for around five years and that she and her boyfriend, B.P., went weekly to Minor's house on North Harris Avenue to buy heroin.

{¶ 8} A.B. related that on June 24, 2014, she and B.P. went to Minor's house on Harris Avenue. A.B.'s testimony varied on the exact sequence of events, whether she and B.P. had been there earlier in the day, whether B.P. was intending to apply a tattoo at the residence or trade tattooing equipment for heroin, and whether someone called to her from within the house or whether someone called to B.P. However, on at least some occasions while testifying she said that she thought Reed had called B.P. and her into the house. A.B. testified that once she was inside the house, someone, she was not sure who, displayed a weapon and told her to go in the kitchen, empty her pockets, and strip. Apparently, heroin had gone missing and the people in the house on North Harris Avenue thought she and B.P. had taken it.

{¶ 9} Once she and B.P. had complied in disrobing, someone, she was not sure who, performed cavity searches on her and B.P. in the kitchen. Some time later, she and B.P. were taken into the basement of the house where Minor and other unidentified persons also performed anal and vaginal cavity searches on her using gloves from A.B.'s purse which she had for tattooing purposes. In the basement, a number of unidentified persons, not believing A.B. and B.P.'s protestations that they had not stolen heroin, began to beat B.P.

{¶ 10} The beating began with a bottle but they also used a BB gun, a leather strap, a knife, as well as feet and hands. A.B. was able to identify the BB gun, bucket, and strap offered into evidence among the State's trial exhibits. Specifically, A.B. testified that some people (whom she simply referred to as "they") broke a bottle on B.P.'s head, stomped him with their feet, hit him with their hands, wetted the leather strap and whipped his back with it, smashed his toes with the butt of the BB gun, and shot him in the bottom and the genitals with the BB gun. (Tr. Vol. 2 at 128-30.) They also forced B.P. into a dog cage and sodomized him anally with a broom handle without a broom attached to it. At times

No. 15AP-952

when B.P. passed out, they dumped cold water on him to revive him for further beatings. Also, while B.P. was in the cage, they were heating up a knife tip and branding him with it. In addition, A.B. testified that, someone (she did not know who) kicked her in the head a couple of times when the beating first started.

{¶ 11} At no time did A.B. identify who did what during the beatings except to say that Minor and one of his co-defendants, Davonte Clark, stomped B.P. and hit him with their hands. A.B. estimated that she was kept in the basement for at least six hours before she was allowed to leave. She did not attempt to leave or check if the door was locked. However, according to her testimony, Reed and his three co-defendants came downstairs at points to make sure she and B.P. were down there. She also said someone recorded a video of her, naked on top of B.P.'s cage, urinating on him.

{¶ 12} Toward the end of the night, someone gave A.B. some heroin and B.P. some meth to help with their pain and withdrawal sickness. Eventually, the captors let A.B. and B.P. go free reasoning that it had begun to rain outside and any heroin that A.B. and B.P. might have stolen and stashed outside would be ruined. At least Minor, and maybe other persons, warned A.B. and B.P. not to call the police. When she retrieved her belongings and got dressed, A.B. was missing three cell phones and $30. However, neither she nor B.P. called the police. Instead they walked to a friend's house who, when it was apparent that B.P.'s health was poor, took them to Mount Carmel West Hospital.

{¶ 13} A.B. was able to identify all four defendants at trial. However, she admitted on cross-examination that she was in heroin withdrawal during the ordeal and that heroin has a mind altering effect that can make things seem real that are not. Moreover she explained that Reed had not assaulted or touched her and, other than calling them into the house and checking on them in the basement, had no involvement in the activities that night.

{¶ 14} The next grouping of witnesses was composed of staff from Mount Carmel West Hospital; three sexual assault nurses who collected forensic observations and took photographs of the injuries sustained by A.B. and B.P. and a treating resident physician who treated B.P. According to the physician's testimony, B.P. presented with numerous lacerations, a broken rib, a collapsed left lung, a ruptured spleen rating 4 of 5 on the severity scale, a broken toe, a fractured tailbone, a bruised scrotum, and abrasions around

his anus. He was admitted to the intensive care unit and remained there for 5 days. The forensic nurse manager for Mount Carmel Health System also testified, describing the photographed injuries to B.P. and authenticating the exhibits showing injuries.

{¶ 15} Another nurse testified that she performed an exam of A.B. and testified to bruising and other minor injuries to A.B. visible in photographs. This nurse testified that A.B. told her that fingers had been used to penetrate her vaginal area and "butt." (Tr. Vol. 2 at 458.) The nurses also testified that they swabbed areas where foreign DNA might have been present based on the history recounted by A.B. and B.P. and preserved the rape kit for the police.

{¶ 16} The State next called a DNA expert forensic scientist with the Ohio Bureau of Criminal Investigation. According to the expert, DNA tests were run on the rape kits collected from A.B. and B.P., as well as numerous articles found at the scene like the broom handle, BB gun, and pistol. No foreign DNA sufficient for comparison with conventional DNA testing was found in the rape kits or on any of the articles except the BB gun. *Id.* And Minor, Clark, and Reed could be excluded as contributors to the DNA mixture obtained from the BB gun. The expert testified that Y-STR DNA testing yields a less exact result. The testing produced two DNA profiles on one end of one broom handle, a major and a minor profile. The major profile was consistent with B.P. but Minor, Clark, and Reed were all excluded as contributors to the minor profile.

{¶ 17} Thereafter, a canine handling officer for the Columbus Division of Police testified that on June 25, 2014, he was called to 125 North Harris Avenue at 6:24 a.m. with the SWAT team to help effect an arrest because despite the police having announced their presence, people were not coming out of the house. He testified that after about 15 or 20 minutes, Reed jumped from the second floor window and began limping toward him and a SWAT officer.) Because Reed did not immediately get on the ground when ordered to do so, the SWAT officer hit him with the barrel of his rifle and they arrested him. Other than Reed, everyone else who was in the house came out in an orderly and respectful fashion with their hands raised.

{¶ 18} The final witness called by the State was an expert in cell phone analysis with the Columbus Division of Police. He testified that a detective on the case presented him with an Apple iPhone 4 and asked him to obtain the phone's contents. He was able to

No. 15AP-952

use software to bypass the phone's security code and download the contents. Both the Apple ID and the Kik[2] ID information on the phone were associated with the name "Charles Reed." (Tr. Vol. 3 at 575-77.) The expert explained, that from his review of the phone's contents, he was able to determine that on June 24, 2014, at 5:18 p.m., a text was sent from the iPhone to a recipient named "Destiny" which said, "I am on Harris." (Tr. Vol. 3 at 578.) Then at 1:05 a.m. on June 25, the iPhone received a message that said, "[d]id that situation resolve itself at Harris?" (Tr. Vol. 3 at 579-80.) In addition, the iPhone contained a video showing A.B. naked in front of a dog cage appearing to urinate on B.P. The expert explained that while he could not say that this particular phone took the video, he could tell that the video was taken by the same model of phone running the same edition of the operating system, that the video was taken on June 24, 2014, at 4:46 p.m., and that it was taken at the house on North Harris Avenue.

{¶ 19} Following the last of its witnesses and the admission of exhibits, the trial court heard motions by the defendants for acquittal under Crim.R. 29. The State admitted that the evidence was insufficient on three counts of the indictment as to all defendants and the trial court dismissed those counts.

{¶ 20} After closing arguments, jury instructions, and deliberations, on August 11, 2015, the jury returned verdicts. The jury found Minor, Reed, and Clark to each be guilty of five counts of felonious assault and two counts of kidnapping. It also found that Minor and Clark were each guilty of two counts of rape. It acquitted on all remaining counts.

{¶ 21} On September 10, 2015, the trial court held a sentencing hearing. The trial court, after a lengthy explanation of the factors and purposes of sentencing, sentenced Reed to a total of 15 years in prison. Specifically, the trial court determined that the felonious assault counts should merge and sentenced Reed to 5 years on the merged count, as well as 5 years on each of the 2 kidnapping counts, each to be served consecutively to the others.

{¶ 22} Reed now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 23} Reed raises two assignments of error for review:

---

[2] Kik is a messaging application. (Tr. at 576-77.)

[I.] THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF FELONIOUS ASSAULT AND KIDNAPPING AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[II.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

## III. DISCUSSION

### A. First Assignment of Error—Whether the Convictions were Sufficiently Supported by the Evidence and Whether they were Contrary to the Manifest Weight of the Evidence

{¶ 24} In his first assignment of error, Reed argues that his convictions were not supported by sufficient evidence and that they were against the manifest weight of the evidence. The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 25} Sufficiency is:

"[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. ' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

No. 15AP-952

{¶ 26} By contrast:

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. For a manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Fla.*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 27} There are also noteworthy differences in how the two concepts are treated procedurally. While a majority of a reviewing court may find that evidence was insufficient, "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio Constitution, Article IV, Section 3(B)(3); *Thompkins* at 380, paragraphs three and four of the syllabus. In addition, the consequences of appellate findings on manifest weight as opposed to sufficiency are different. "[T]he Double Jeopardy Clause does not preclude retrial of a defendant if the reversal was grounded upon a finding that the conviction was against the weight of the evidence. However, retrial is barred if the reversal was based upon a finding that the evidence was legally insufficient to support the conviction." *Id.* at 387, citing *Tibbs* at 47.

### 1. Felonious Assault

{¶ 28} In Ohio, the offense of felonious assault includes the following prohibition:

> No person shall knowingly do * * * the following:
>
> (1) Cause serious physical harm to another * * *.

R.C. 2903.11(A)(1). "Serious physical harm" is separately defined in relevant part as:

> (b) Any physical harm that carries a substantial risk of death;

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> * * *
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(b), (c), and (e). Moreover, although no evidence was introduced at trial that Reed ever physically touched A.B. or B.P., a person who is complicit in an offense "shall be prosecuted and punished as if he were a principal offender," and a person is complicit in the sense potentially relevant here when, "acting with the kind of culpability required for the commission of an offense" the person "[a]id[s] or abet[s] another in committing the offense." R.C. 2923.03(A)(2) and (F).

{¶ 29} A.B. testified that Minor and Clark stomped B.P. with their feet and hit him with their hands. The physician from Mount Carmel West Hospital who treated B.P. testified that B.P. presented with, among other injuries, a broken rib, a collapsed left lung, and a ruptured spleen rating 4 of 5 on the severity scale. The physician testified that due to his condition, B.P. was admitted to the intensive care unit where he remained throughout his 5-day hospitalization. This testimony, when considered in the " 'light most favorable to the prosecution' " was sufficient to support the conclusion that some persons feloniously assaulted B.P. but not that Reed did. *Monroe* at ¶ 47, quoting *Jenks* at paragraph two of the syllabus.

{¶ 30} The question then, is whether the evidence was sufficient to conclude that Reed was complicitous to the felonious assault. It is settled law that " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001), quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). However, " 'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed. ' " *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971). Thus, the appropriate consideration is whether there were facts sufficient to show that Reed shared the criminal intent of those persons who assaulted B.P.

{¶ 31} A.B. testified that Reed was not involved in the assault of B.P. Although she equivocated on the issue, she said Reed checked on her and B.P. while they were in the basement. In addition, though her testimony varied on this point also, A.B. testified that Reed may have been the person who called B.P. and her into the house. Moreover, an expert in cell phone analysis with the Columbus Division of Police testified that the Apple iPhone 4 recovered from the scene contained Apple ID and Kik ID information indicating the accounts on that phone were associated with "Charles Reed." (Tr. Vol. 3 at 568-70, 575-77.) According to the expert, on June 24, 2014, at 5:18 p.m., a text was sent from the iPhone to a recipient named "Destiny" which said, "I am on Harris." (Tr. Vol. 3 at 578.) Then at 1:05 a.m. on June 25, the iPhone received a message that said, "[d]id that situation resolve itself at Harris?" (Tr. Vol. 3 at 579.) The iPhone contained a video showing A.B. naked in front of a dog cage appearing to urinate on B.P. The expert explained that while he could not say that this particular phone took the video, he could discern that the video was taken by the same model of phone running the same edition of the operating system, that the video was taken on June 24, 2014 at 4:46 p.m., and that it was taken at the house on North Harris Avenue. Finally, the officer who arrested Reed testified that he attempted to flee the house on North Harris Avenue when the police arrived.

{¶ 32} " '[V]iewing the evidence in a light most favorable to the prosecution,' " we find that a " 'rational trier of fact could have found' " that Reed participated in the criminal intent of those persons who perpetrated the felonious assault. *Monroe* at ¶ 47, quoting *Jenks* at paragraph two of the syllabus. Though the expert could not definitively say that the iPhone 4 in question belonged to Reed or that it had been used to take the video of A.B. and B.P., a reasonable jury could have inferred both those facts from the expert's testimony. We find the evidence was sufficient for the jury to find that Reed was a complicitor in causing serious physical harm to B.P., being present in the basement during the assaults, and apparently involved enough to record a video of the crime scene during the time of the events in question. In addition, although A.B. equivocated on this point, A.B.'s testimony was sufficient for the jury to conclude that Reed was instrumental in inviting A.B. and B.P. back to the house where the assaults occurred and, thereafter, participated in keeping them in the house during the time period of the assaults. Finally,

No. 15AP-952

Reed's flight from the house (though also potentially understandable as a desire to not be arrested at a drug house) could be consciousness of guilt about the treatment of A.B. and B.P. Taken as a whole, the evidence was sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that Reed was complicit in the felonious assault of B.P.

{¶ 33} When considering manifest weight of the evidence, there was no suggestion by the evidence that B.P.'s injuries were feigned or that the physician who testified was not credible or incorrect in his testimony. When considering whether the evidence introduced at trial was weighty enough to support the conviction, the issue resolves to a question of whether A.B. was credible in reporting how B.P. sustained the injuries, at whose hands, and the extent of Reed's participation and complicity in the assault on B.P.

{¶ 34} A.B.'s testimony that B.P. was stomped was convincingly corroborated by the fact that B.P. had a collapsed lung, broken rib, and ruptured spleen when he arrived at the hospital. Moreover, Reed's involvement in A.B.'s and B.P.'s presence at the house at 125 North Harris Avenue during the evening was corroborated by the cell phone video recovered from Reed's phone depicting A.B. and B.P. in a state of naked misery at 125 North Harris Avenue on June 24, 2014 at 4:46 p.m.

{¶ 35} A.B. was, at the time of the incident, a heroin addict who was experiencing symptoms of withdrawal. Her testimony was inconsistent throughout trial about who did what and how many assailants there were. Rather than make allegations about any specific defendant, she repeatedly used vague pronouns such as "they" or "them." (Tr. Vol. 2 at 128-30.) She also, at one point, appeared to testify that many of the people who harmed her were not defendants at trial. A.B. admitted to being a thief and "boosting" (stealing barter items to obtain heroin) repeatedly for ten years. (Tr. Vol. 2 at 208.) She admitted to having lied to the police when she spoke to them at the hospital. She also admitted she did not remember what she said at the hospital or whether she had initially claimed to have been raped by four or five men. Reed was excluded as a contributor to all the useable DNA samples collected from bodies of B.P. and A.B. as well as the various implements allegedly used on B.P. Finally, A.B. equivocated about the extent of Reed's participation in the entire evening:

Q. Do you know who came down to check on you?

No. 15AP-952

A. There was several different people.

Q. Okay. Who?

A. [Minor] had [Clark], [an acquitted co-defendant], and [Reed].

Q. They all what?

A. They all checked on us at one point.

* * *

Q. And what involvement did [Reed] have that night?

A. Not a whole lot. He checked on us in the basement, nothing else, really.

Q. Did he ever make sure that you didn't leave?

A. I am not sure.

* * *

Q. What was [Reed's] involvement?

A. Not a whole lot of anything. Calling us back to the house, really.

Q. Did he come in and out of the basement?

A. I am not real sure.

Q. Did you see him throughout the night?

A. No.

* * *

Q. I think when you first testified, you said you think that [Reed] may have been the person who called you back in?

A. Yes.

Q. Do you recall that there were other people outside at the same time when [Reed] was out there?

A. There might have been a couple people. I remember him saying, hey, you know, asking [B.P.] to come back.

No. 15AP-952

> Q. Do you remember being interviewed by the police? I guess maybe you don't recall being interviewed by the police?
>
> A. I don't recall a lot of it, no.
>
> Q. If you told the police that [Reed] was out there along with [Clark] and several other people, and that you weren't sure who was calling you back?
>
> A. No, I don't remember hearing that.
>
> Q. Would you have any reason to lie about that?
>
> A. No.

(Tr. Vol. 2 at 134-35, 151, 154-55, 202.)

{¶ 36} After review of the record, we cannot say, based on the evidence in this case, that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. We conclude that the conviction for felonious assault as a complicitor is not against the manifest weight of the evidence.

### 2. Kidnapping

{¶ 37} The Ohio Revised Code defines the offense of kidnapping in relevant part as follows:

> (A) No person, by force [or] threat, * * * shall * * * restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> * * *
>
> (B) No person, by force [or] threat, * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim * * * :
>
> * * *
>
> (2) Restrain another of the other person's liberty.

No. 15AP-952

R.C. 2905.01(A)(2), (3), (B)(2). A person who is complicit in an offense "shall be prosecuted and punished as if he were a principal offender," and a person may be found to be complicit when, "acting with the kind of culpability required for the commission of an offense," the person "[a]id[s] or abet[s] another in committing the offense." R.C. 2923.03(A)(2) and (F).

{¶ 38} A.B. testified that after she and B.P. were forced at gunpoint to strip naked and sent into the basement, that they were not permitted to leave for six hours. Although A.B. testified that she did not check to see if the basement door was locked, a number of persons, including Reed, came down to the basement from time to time to make sure they were still there. In addition, B.P. was caused serious physical harm while he was being held in the basement. This evidence was sufficient to sustain the convictions for kidnapping as set forth above.

{¶ 39} Despite the general vagueness of A.B.'s testimony in general and the other issues affecting her credibility, the video shot of A.B. and B.P. in the basement of 125 North Harris Avenue is strong corroborating evidence that A.B. and B.P. were being forcibly kept for some period of time in the basement of that premises. Under the circumstances and after review of the record, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. We thus determine that the convictions for kidnapping are not against the manifest weight of the evidence.

{¶ 40} Reed's first assignment of error is overruled.

**B. Second Assignment of Error—Whether the Trial Court Properly Complied with R.C. 2929.14(C)(4) in Sentencing Reed to Consecutive Sentences**

{¶ 41} Ohio Revised Code 2929.14(C)(4) specifies a number of findings a trial court must make when it sentences an offender to serve consecutive terms of imprisonment:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the

offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

The Supreme Court has more than once held that:

[I]f a trial judge exercises his or her discretion to impose consecutive sentences, he or she must make the consecutive-sentence findings set out in R.C. 2929.14(C)(4), and those findings must be made at the sentencing hearing and incorporated into the sentencing entry.

*State v. Sergent*, ___ Ohio St.3d ___, 2016-Ohio-2696, ¶ 17, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 23.

{¶ 42} In this case, the trial court orally explained in the sentencing hearing that it was considering and making the findings required by R.C. 2929.14(C)(4) as follows:

Pursuant to Revised Code Section 2929.14 subsection C4, the court imposed consecutive sentences in order to ensure the safety of the community, because these convictions reflect the continuing course of conduct and because the court believes that no single sentence would adequately cover the offenses for which Mr. Reed has been convicted. So the court is imposing consecutive sentences in this matter.

(Tr. Vol. 7 at 921-22.) This statement omits the required finding "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4).

{¶ 43} In its judgment entry, the trial court attempted to correct the omission by including the following statement:

No. 15AP-952

> The Court made findings on the record, pursuant to R.C. 2929.14(C)(4), to support consecutive sentences. Considering the facts of this case, the purposes and principals of sentencing, and the requirements set forth in R.C. 2929.14(C)(4), the Court finds that a consecutive sentence is both necessary and appropriate. The Court further finds that (a) a consecutive sentence is necessary to punish Defendant, given the seriousness of the offenses committed; (b) a consecutive sentence is not disproportionate to the seriousness of Defendant's conduct; (c) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; and (d) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Sept. 17, 2015 Jgmt. Entry at 2.)

{¶ 44} However, the Supreme Court has explained:

> A trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court. *See State v. Qualls*, 131 Ohio St.3d 499, 2012-Ohio-1111, 967 N.E.2d 718, ¶ 15 (where notification of postrelease control was accurately given at the sentencing hearing, an inadvertent failure to incorporate that notice into the sentence may be corrected by a nunc pro tunc entry without a new sentencing hearing). *But a nunc pro tunc entry cannot cure the failure to make the required findings at the time of imposing sentence. See State v. Miller*, 127 Ohio St.3d 407, 2010-Ohio-5705, 940 N.E.2d 924, ¶ 16 ("a nunc pro tunc order cannot cure the failure of a judge to impose restitution in the first instance at sentencing").

(Emphasis added.) *Bonnell* at ¶ 30. Moreover:

> This court has consistently held that "when the record demonstrates that the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, 'appellant's sentence is contrary to law and constitutes plain error.' " *State v. Ayers*, 10th Dist. No. 13AP-371, 2014-Ohio-276, ¶ 15, quoting *State v.*

> *Wilson*, 10th Dist. No. 12AP-551, 2013-Ohio-1520, ¶ 18. *See also State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 18, citing *State v. Boynton*, 10th Dist. No. 12AP-975, 2013-Ohio-3794 (because the trial court failed to make the R.C. 2929.14(C)(4) findings on the record, appellant's sentence is contrary to law and constitutes plain error).

*State v. J.H.S.*, 10th Dist. No. 14AP-399, 2015-Ohio-254, ¶ 17.

{¶ 45} Therefore, despite the trial court's attempt to correct its mistake at sentencing by a fuller exposition in its judgment entry, remand is necessary for the trial court " 'to consider whether consecutive sentences are appropriate, pursuant to R.C. 2929.14(C)(4), and, if so, to make the proper findings on the record at the sentencing hearing and incorporate those findings into its sentencing entry.' " *J.H.S.* at ¶ 18, quoting *State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 18, citing *Bonnell.*

{¶ 46} Reed's second assignment of error is sustained.

## IV. CONCLUSION

{¶ 47} Because Reed's convictions are supported by sufficient evidence and not contrary to the manifest weight of the evidence, we overrule his first assignment of error. However, because the trial court did not make all the required findings at the time of sentencing, Reed's second assignment of error is sustained. We remand this matter to the Franklin County Court of Common Pleas for a new sentencing hearing at which the trial court, in considering whether consecutive sentences are appropriate, must make all the required findings on the record.

*Judgment affirmed in part, reversed in part, and cause remanded with instructions.*

DORRIAN, P.J., and SADLER, J., concur.